55 10

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | PAUL E. PLUNKETT | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5749 | **DATE** | 11-20-02 |
| **CASE TITLE** | Charles N. Miceli (# D87412) v. Federal Bureau of Investigation, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

## DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____.  Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter memorandum opinion and order.  Plaintiff's motion for leave to proceed in forma pauperis [3-1] is granted.  Instructions for the installment payment of the filing fee pursuant to 28 U.S.C. § 1915(b) will be entered by separate order.  After reviewing the complaint in accordance with 28 U.S.C. § 1915A, the court dismisses this action as frivolous.  This dismissal counts as one of plaintiff's three allotted dismissals under 28 U.S.C. § 1915(g).

(11) ■ For further detail see order attached to the original minute order.

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | | | 11 |
| | Notified counsel by telephone. | | NOV 2 1 2002 | | |
| ✓ | Docketing to mail notices. | | date docketed | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| 7L | courtroom deputy's initials | 02 NOV 20 AM 10: 30  FILED-10 | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NOV 2 1 2002

CHARLES N. MICELI,                        )
                                          )
        Plaintiff,                        )
                                          )        No.  02 C 5749
        v.                                )
                                          )        Judge Paul E. Plunkett
FEDERAL BUREAU OF INVESTIGATION,          )
CHICAGO DIVISION, et al.,                 )
                                          )
        Defendants.                       )

## MEMORANDUM OPINION AND ORDER

Plaintiff Charles N. Miceli, a prisoner in the custody of the Florida Department of
Corrections, has filed a *pro se* civil rights complaint alleging that Chicago and federal law
enforcement officers and agencies have violated his constitutional rights. Miceli alleges that he
provided confidential information to law enforcement agencies concerning organized crime and
police corruption and was betrayed to those he had fingered. Miceli was not protected from
violence at their hands, and those whose guilt he exposed have not been investigated and
prosecuted. Miceli demands an investigation, the appointment of a special prosecutor, protection
for himself and his family, and damages.[1]

Miceli's motion for leave to proceed without prepayment of the filing fee is granted. A
separate order shall be entered directing the collection of the initial partial filing fee and installment
payments as required by 28 U.S.C. § 1915(b), part of the Prison Litigation Reform Act (PLRA).
Another portion of the PLRA, 28 U.S.C. § 1915A, requires the court to review prisoners'
complaints against governmental entities or their officers or employees and dismiss any portion of
the complaint it finds frivolous, malicious, fails to state a claim upon which relief may be granted,
or seeks monetary relief from a defendant immune from such relief. In determining whether the
complaint states a claim upon which relief may be granted, the court applies the standard employed

---

[1] Miceli continues to fear for his safety; shortly after this case was filed, Miceli sought an injunction requiring
state and federal officials in Florida to provide him with a higher level of protection. Because the persons presently
responsible for Miceli's custody and safety are not defendants in this action, the court denied the motion without
prejudice to Miceli's filing a separate suit in Florida.

in deciding a motion to dismiss under Rule 12(b)(6), taking all well-pleaded allegations of the complaint as true and viewing them in the light most favorable to the plaintiff. *Zimmerman v. Tribble*, 226 F.3d 568, 571 (7th Cir. 2000).

## ALLEGATIONS OF THE COMPLAINT

It has been necessary to reorder Miceli's allegations, since the various incidents are not given in chronological order. Miceli's career as an informant goes back at least to 1990, when he provided information to the FBI regarding James "Jack" Novelli, convicted in this court in 1992 of governmental corruption in violation of 18 U.S.C. § 666 and 371. Miceli alleges his problems began when he contacted the FBI and the Chicago Police Department with information regarding criminal conduct of a certain Marvin Cruz, who, he alleges has never been "properly investigated or arrested for his criminal activities," and his association with corrupt Chicago police officers whom he names in the complaint.

Miceli states that "throughout early 1995" he attempted to work with the Chicago police with regards to criminal activities of [Cruz]." In October of 1995 Miceli met with defendant F.B.I. agent Tracy Pierce and FBI Chicago police liaison George Patton, and provided them with audiotapes of Cruz attempting to extort and threaten Miceli. Nothing was done with the tape, there was no investigation, and Pearce later told other law enforcement agents that the tape had been destroyed.

In December of 1995, Miceli met with defendant Sergeant Isaac of the Chicago police internal affairs unit. Isaac told Miceli that Cruz was an informant for the Chicago police department and had "a long history of criminal conduct with members of the Chicago Police Department."

Miceli also states that in December of 1995 he contacted defendant Lieutenant James Gunnery of the Chicago Police Internal Affairs unit. Miceli does not explain why he was dealing with both Isaac and Gunnery at the same time, or whether each of them was aware of his contact with the other. Gunnery promised that the information Miceli gave him would be kept confidential, but Miceli alleges that it was leaked to unnamed "members of organized crime" as

well as to the police officers Miceli had identified to Gunnery. Miceli does not allege who was actually responsible for the leak or leaks, and presumably does not know.

At the same time -- December of 1995 -- Miceli alleges that defendant Gerald Thies, an FBI special agent, came to his house in Arlington Heights, Illinois and told him that Marvin Cruz and John Skiersch had placed a "hit," a murder contract, on Miceli because of his cooperation with law enforcement agencies. According to Miceli, Thies told him to "pay Mr. Cruz whatever [Cruz] wanted to stop the hit." Subsequently Cruz used the threat of murder to coerce Miceli's wife into a sexual relationship and sexually assaulted Miceli's young daughter.

Miceli alleges that because Cruz had himself become an informant, law enforcement agencies would not investigate or prosecute him. He states that on unspecified occasions he wrote to Chicago Police Superintendent Matt Rodriguez and his successor, Terrence Hillard, and received no response. He alleges Rodriguez refused to "force an investigation" after Miceli provided evidence to the media in February of 1997 that Cruz was furnishing prostitutes to a Chicago police officer.

As a consequence of the disclosure of confidential information Miceli had given Gunnery, on February 16, 1997, two Chicago police officers entered Miceli's home in Stone Park, Illinois and beat Miceli unconscious. While Miceli was in the hospital, investigators from the Chicago Police Department interviewed him and encouraged him to continue his cooperation. The case agent, defendant Sergeant James Dooley, promised Miceli that if he turned over certain videotapes, Dooley would guarantee Miceli's safety and "that the case against the Chicago Police officers and others would be prosecuted." Miceli agreed to cooperate.

On the evening of March 21, 1997, Miceli contacted Dooley and arranged to meet him the following day and turn over all the evidence he had of police corruption. Approximately four hours after Miceli made the call to Dooley, four assailants broke into Miceli's home and tortured him into surrendering his evidence to them. He was found bound and unconscious by his mother later that evening and his home had been ransacked. The Stone Park detective investigating the incident, Louis Fatta, asked why Miceli had not asked the Stone Park police to protect him; Miceli responded that he had been warned by Gunnery and Dooley not to involve the Stone Park police because they were supposedly corrupt and tied to organized crime.

3

Miceli no longer had the videotapes, and the Chicago Police Department internal affairs unit told Miceli that without the tapes they would not pursue the investigation of the Chicago officers. Miceli alleges that with Fatta's assistance he sought to have criminal charges brought against the Chicago police officers involved in the home invasion, but Fatta's investigation was obstructed by the Chicago Police Department internal affairs unit.

In June of 1997, Miceli was arrested by Chicago police officers without a warrant "for a non-existent case," and while he was in custody he as warned that if he did not cease his pursuit of the police officers he would be killed. While in police custody, Miceli called the United States Attorney's office and told defendant Assistant U.S. Attorney Brian Netols "of his situation and fears." An hour later, because he had been refused his heart medication, Miceli collapsed and was hospitalized for acute angina. His mother contacted Netols, and shortly thereafter Miceli was released on a $100.00 bond.

Miceli then contacted defendant Jim Davis, an FBI special agent and supervisor, told him "of his situation and fears," and gave him an audio tape proving that the Chicago Police Department's internal affairs unit was obstructing justice in connection with the home invasion and assault on Miceli by attempting to conceal the fact that two assailants were Chicago police officers. The FBI did not investigate, but turned the evidence over to the Chicago Police Department, and Miceli was charged with unlawful eavesdropping by defendant Sergeant Mark Buslik of the Chicago Police internal affairs office. The FBI did not respond to numerous requests for help and protection for Miceli and his family.

In 1998 and 1999 Miceli alleges he employed as many as eight Cook County sheriff's deputies as personal bodyguards. By exploiting their offices, they enabled Miceli to bypass airline security measures and board two commercial flights while armed (in one case also carrying explosives), in violation of federal law. Miceli complains that these accomplices have not been prosecuted, although the Cook County Inspector General's office, as well as the FBI, has "concrete evidence" corroborating Miceli's allegations.

At some unspecified time in 1999, attorney Thomas Freeman introduced Miceli to John N. Rotunno, a special agent with the arson unit of the Bureau of Alcohol, Tobacco and Firearms (ATF) in Chicago. Since then, Miceli has provided Rotunno with information regarding several

4

murders, arsons and sundry other crimes as well as official corruption involving several judges and prosecutors. He claims to have given the ATF the locations of the corpses of twenty-seven murder victims, but the ATF never attempted to recover them. Miceli complains that he has never "been properly interviewed and de-briefed" regarding what he knows of these crimes and the workings of organized crime syndicates in New York, Chicago and Florida. He also states that the "U.S. Attorneys" are aware that he passed $50,000 to a Chicago police officer as part of a contract to murder the wife of an organized crime figure and that the "contract" is still pending, implying that nothing has been done to prevent the murder.

## ANALYSIS

Miceli's lurid account, which for the sake of this initial review the court must assume to be true, cries out for action-- but not for action by this court. Miceli's complaint reflects a fundamental misunderstanding of this court's function. A federal court is not a super-agency, overseeing municipal, state and federal law enforcement agencies and compelling them to perform their duties. The court resolves concrete disputes between particular parties where the Constitution and laws of the United States grant it the power to do so. After examining the complaint, the court finds that (1) Miceli has no claim against the governmental entities named as defendants; (2) most of the actions of which Miceli complains did not violate his constitutional rights; and (3) claims regarding actions which may have violated Miceli's rights are barred by the statute of limitations.

### I. DEFENDANTS

#### A. Federal Entities

Both the Federal Bureau of Investigation and the "United States Attorney's Office" (which is not an independent agency but part of the Department of Justice) share the sovereign immunity of the United States. The Supreme Court has recognized an implied federal right of action against federal officials for claims of deprivation of constitutional rights under color of federal authority. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). However, the right of action recognized in *Bivens* is limited to claims against individual federal officers and does not extend to federal agencies. *FDIC v. Meyer*, 510 U.S. 471 (1994). Federal

agencies may be sued only to the extent that the sovereign immunity of the United States has been waived. The Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* (FTCA), provides a limited waiver of sovereign immunity for tort claims, but requires exhaustion of administrative remedies, 28 U.S.C. § 2675. Miceli has not alleged that he has complied with the prerequisites of the FTCA. Further, the FTCA permits the United States to be sued for acts by federal employees that would render the United States liable, if it were a private person, *under state tort law*; it does not waive sovereign immunity for constitutional torts. 28 U.S.C. § 1346(b); *Meyer,* 510 U.S. at 477. The FBI and "United States Attorney's Office" must be dismissed.

### B. City of Chicago and Cook County

Miceli has also not stated a claim against the Chicago Police Department, which is not a legal entity but part of the City of Chicago. Individual municipal officials may be sued for deprivations of constitutional rights under 42 U.S.C. § 1983, but there is no *respondeat superior* liability under § 1983, i.e., a municipality is not automatically liable for constitutional violations committed by its employees in the course of their employment. *Latuszkin v. City of Chicago,* 250 F.3d 502, 503 (7th Cir. 2001); *Lanigan v. Village of East Hazel Crest,* 110 F.3d 467, 478 (7th Cir. 1997). The Chicago Police Department, that is, the City of Chicago, can be liable only if Miceli's injury was a result of either (1) the enforcement of an express policy of the City, (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) action by a person with final policymaking authority. *Id.,* 250 F.3d at 503-504.

Miceli has not alleged that he was injured as a consequence of any custom or official policy of the City of Chicago. The fact that a number of police officers, including supervisors, conspired to violate Miceli's rights is not enough to establish a custom or policy unless knowledge and approval extended to the policymaking level. *Id.* Miceli alleges that he wrote to Chicago Police Superintendent Matt Rodriguez and his successor, Terrence Hillard, but, as *Latuszkin* notes, the Superintendent of Police is not a policymaker for the City. *Id.* at 505 (citing *Auriemma v. Rice,* 957 F.2d 397 (7th Cir. 1992). Miceli has not stated a claim against the City of Chicago.

Miceli is even further from stating a claim against Cook County, in that he only alleges that its Inspector General, Thomas Swaine, knows of criminal misconduct by Cook County sheriff's deputies. Apart from the fact that Swaine's inaction did not violate Miceli's rights, as discussed below, it can hardly be considered to amount to a policy or custom of Cook County.

### C. Official Capacity Claims

A claim brought against a governmental employee in his or her official capacity amounts to a claim against the employing governmental entity. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Because Miceli has no claim against the United States, any official-capacity claims against the defendant federal officers must be dismissed. *Sterling v. United States*, 85 F.3d 1225, 1228-29 (7th Cir. 1996). The same goes for official-capacity claims against municipal and county officials. *Lanigan*, 110 F.3d at 479 n.5.

## II. FAILURE TO INVESTIGATE OR PROSECUTE

Miceli complains of three kinds of actions or inactions by the various defendants: (1) that they failed to follow up on information Miceli had given them concerning criminal activity and official corruption; (2) that they leaked information to those in league with the targets of Miceli's disclosures, and (3) they failed to protect Miceli from retaliation and intimidation.

The first category does not state a claim. The various law-enforcement officials to whom Miceli provided information regarding criminal behavior had a duty to act upon it, but that duty was owed to the governmental entities they served, not to Miceli. Miceli's interest, as a citizen, in having the law enforced and criminals prosecuted, does not create standing to sue in federal court. Article III of the Constitution authorizes federal courts to decide "cases" and "controversies," not issue general pronouncements or supervise other branches of government. A justiciable "case" or "controversy" requires that the plaintiff allege a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984). Most of the unlawful conduct Miceli allegedly denounced and attempted to stop had no direct effect on him. While all citizens are benefitted by diligent law enforcement untainted by corruption, there is a difference between a

political or social interest and a constitutional right. *Clay v. Fort Wayne Community Schools*, 76 F.3d 873, 878 (7th Cir. 1996). "[A]n asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." *Allen*, 468 U.S. at 754.

Miceli would seem to be in a different position with respect to the investigation of those who attacked him and presumably might do so again if they believed they could get away with it. Nevertheless, because investigation would not guarantee prosecution, much less conviction, it is doubtful whether Miceli would have standing to complain of defendants' failure to investigate. *See Leeke v. Timmerman*, 454 U.S. 83, 86-87 (1981). In any event, standing, a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief," is only the first step. There must be an underlying legal right. As the Supreme Court repeated in *Leeke*, quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973), "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Leeke*, 454 U.S. at 86. So Miceli has no federal claim against the defendants for failing to investigate and initiate the prosecution of criminals, even criminals who have directly injured him. *Johnson v. City of Evanston*, 250 F.3d 560, 563 (7th Cir. 2001).

As *Johnson* notes, this rule reflects a more general proposition that the Constitution does not, as a rule, require states to protect citizens from each other. *Id.* The Constitution is primarily "a charter of negative liberties." It creates areas in which the government has to let people alone, but does not entitle them to demand services, such as police protection. *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000) (citing *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 195-97 (1989)).

*DeShaney* teaches that while state officials are forbidden by the Fourteenth Amendment to deprive a person of life, liberty or property without due process of law, they do not do so merely by failing to protect a person from harm caused by someone not acting for the state. *DeShaney* was a suit brought on behalf of a child who had been badly beaten by his father after employees of the state child protection agency disregarded reports of abuse and failed to remove him from his father's custody. The Supreme Court, affirming the Seventh Circuit, held that the state had no constitutional duty to protect the child, since although the state was aware of the danger, it

8

played no part creating the danger nor did it render the child more vulnerable. *DeShaney*, 489 U.S. at 201.

Miceli had no constitutional right to demand that law enforcement officers investigate his charges against Cruz (or anyone else), no matter how persuasive his evidence, just as he had no right to demand their arrest or prosecution. Nor did officers' knowledge of a risk to Miceli create a constitutional duty to protect him.

## III. CREATION OF RISK OF HARM

These principles eliminate the bulk of Miceli's complaint, with one significant exception. *DeShaney*'s rationale implies that a state official may be liable where the state official creates the danger of harm, rather than merely fails to prevent it. In *Dykema v. Skoumal*, 261 F.3d 701, 705 (7th Cir. 2001), the Seventh Circuit recently considered the application of this exception to a civilian police informant, Matthew Dykema, who was injured in the course of an investigation. Dykema had inquired of the police about reinstating his suspended driver's license, and the officers' promise to facilitate the return of his driver's license induced him to work for a police investigative unit making drug purchases. Dykema said he was experienced in drug transactions and needed no training.

In order to build a case against a suspected drug dealer, Dantzler, the police planned a "reverse buy," in which Dykema and an officer posing as Dykema's brother would attempt to sell drugs to Dantzler and then arrest him. The reverse buy fell through when Dantzler wanted to inspect the drugs before paying. When Dantzler drove out of the parking lot, agents followed him, and they may have been observed by Dantzler's cousin, Stephen Stepney, who was reportedly acting as protection for Dantzler.

A week later, the officer attempted to complete the reverse buy without Dykema, but Dantzler refused to deal without Dykema present. The next day, officers gave Dykema $20.00 to buy cocaine from Dantzler, telling him to "smooth things over" with Dantzler and tell him they wanted to do business with him another time. After unsuccessfully trying to contact Dantzler, Dykema drove alone to Dantzler's house and was shot by Stepney. *Id.*, 261 F.3d at 702-03.

The court held that these facts did not render the officers liable. The court stated the rule that "state liability may exist if any state action 'creates, or substantially contributes to the creation of a danger or renders citizens more vulnerable to a danger than they otherwise would have been.'" *Id.*, 261 F.3d at 705 (quoting *Reed v. Gardner*, 986 F.2d 1122, 1126 (7th Cir. 1993)). The court noted that Dykema had chosen to cooperate with the police for his own benefit, and was not in custody. Although Dykema had been told to try to "smooth things over" with Dantzler, no one gave Dykema instructions as to what he should do or when he should do it; the details were left to Dykema's judgment as an experienced drug operator. It is common knowledge that drug dealers are often armed, and Dykema assumed the risk. Stepney was not a target of the investigation, and the narcotics unit with which Dykema worked was not aware that he was in any danger from Stepney. Dykema had not been told that the police would protect him, nor did he ask for protection. *Id.*, 261 F.3d at 706-07. The court concluded that the police had not created the risk that Dykema voluntarily assumed by engaging in undercover work for them.

The court contrasted Dykema's situation with that of the plaintiff in *Monfils v. Taylor*, 165 F.3d 511 (7th Cir. 1998), where false assurances of protection had increased the danger to an informant. Monfils, an employee in a paper plant, had made a telephone call to the police informing them that another employee, Kutska, was going to steal plant property, insisting on anonymity because Kutska had a reputation for violence. The police called security at the plant and Kutska was stopped on his way out the door; when he refused to submit to a search he was suspended. Incensed that someone had reported him, Kutska told Monfils and others that he was going to get the police tape and identify the informant. Although Monfils made several calls to the police trying to prevent the release of the recording, and was assured each time that it would never be released, the police gave Kutska a copy. Several hours later Kutska and others brutally murdered Monfils. The Seventh Circuit held that the deputy chief of detectives could be liable under § 1983 for assuring Monfils that the tape would not be released while doing nothing to secure it, placing Monfils in position of danger greater than he would have otherwise faced.

10

Miceli's complaint arguably falls within the rationale of *Monfils*. Miceli alleges that despite promises of confidentiality, information he gave to the internal affairs investigative unit of the Chicago Police Department was leaked to the targets of the investigation, creating a danger of harm that materialized when Miceli was assaulted and beaten.[2/] The difficulty is that Miceli has named as defendants the officers to whom he gave the information that was wrongfully disclosed, but has not alleged that they were responsible for disclosing it.

The court is required to draw reasonable inferences in Miceli's favor. Nevertheless, because the complaint does not allege that the defendants were linked to associates of Cruz, or anyone else Miceli fingered, it can reasonably be inferred that someone was careless, but not that a defendant intentionally leaked the information. Negligence will not support a claim under the Due Process Clause. *Daniels v. Williams*, 474 U.S. 327 (1986); *Davidson v. Cannon*, 474 U.S. 344 (1986); *Harrell v. Cook*, 169 F.3d 428, 432 (7th Cir. 1999). While a due process violation can be based on a defendant's "deliberate indifference" to a risk of harm, this requires "conscious disregard of known or obvious dangers." *Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998). It would have been obvious that the information would be dangerous to Miceli if it got into the wrong hands, but the allegations do not permit the inference that a defendant should have known it was likely to be leaked.


## LIMITATIONS

Although Miceli might be able to cure this problem by amending his complaint, his claims face another barrier, the statute of limitations. Limitations is an affirmative defense, and normally raised by the defendant. Nevertheless, when a valid affirmative defense is evident from the face of the complaint, the court need not wait for an answer before dismissing the suit as frivolous.

---

[2/] Of course, the Chicago policemen who allegedly assaulted and beat Miceli violated his rights under the Due Process Clause, but Miceli has not named them as defendants.

11

*Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002); *Buckley v. Fitzsimmons*, 20 F.3d 789,

793 (7th Cir. 1994); *Bates v. Clarke*, No. 97 C 8467, 1998 WL 122745 (N.D. Ill. 1998)(Zagel,

J.)("The expensive machinery of the federal court should not be set into motion in the hope that

the defendant will blunder and waive an obvious and dispositive defense").

Illinois' two-year statute of limitations for personal injury claims, 735 ILCS 5/13-202,

governs § 1983 claims arising in Illinois. *Henderson v. Bolanda*, 253 F.3d 928, 931 (7th Cir.

2001); *Kelly v. City of Chicago*, 4 F.3d 509, 510 (7th Cir. 1993). It also applies to *Bivens* actions

arising in Illinois against federal officials. *Delgado-Brunet v. Clark*, 93 F.3d 339, 342 (7th Cir.

1996). The limitations period begins to run when the cause of action accrues, which federal

common law defines as when the plaintiff knows, or reasonably should know, that his constitutional

rights have been violated. *Licari v. City of Chicago*, 298 F.3d 664, 668 (7th Cir. 2002); *Wilson

v. Giesen*, 956 F.2d 738, 740 (7th Cir. 1992).

The attacks on Miceli took place in 1997. Because Miceli had reason to know that the

attacks were the result of information he had given to law enforcement authorities, his claims

arising from those attacks accrued at that time. The limitations period would have expired two

years later, more than three years before this suit was filed.

The bar of the statute of limitations may be avoided by the doctrines of equitable tolling and

equitable estoppel, but nothing in the complaint suggests that either would apply here. Equitable

tolling "permits a plaintiff to avoid the bar of the statute of limitations if despite the exercise of

all due diligence he is unable to obtain vital information bearing on the existence of his claim."

*Mitchell v. Donchin*, 286 F.3d 447, 451 (7th Cir. 2002)(quoting *Shropshear v. Corp. Counsel of

Chicago*, 275 F.3d 593, 595 (7th Cir. 2001)). The missing information must go to the existence

of the claim, not its details, i.e., whether a reasonable person would be aware of the possibility

of a claim. *Mitchell*, 286 F.3d at 451. Equitable tolling requires that the plaintiff have exercised

due diligence, both in seeking to discover the necessary facts and in bringing suit once he learns

them. *Id.*; *Shropshear*, 275 F.3d at 595. To invoke equitable tolling, Miceli would have to allege not only that he could not have sued before the limitations period expired in 1999; he would have to allege that even exercising due diligence he could not reasonably have been expected to file suit until mid-2002.

The complaint suggests no grounds for equitable tolling, as it does not appear that Miceli learned any essential fact after 1997. The other exception to the limitations bar, equitable estoppel, applies only when a defendant has taken active steps, by fraud or deception, to prevent the plaintiff from suing in time. *Mitchell*, 286 F.3d at 450; *Shropshear*, 275 F.3d at 595. There is no hint of this in the complaint.

Miceli's only cognizable injuries occurred in 1997. While the defendants' failure to investigate and prosecute Cruz and others allegedly continues to the present day, this does not violate Miceli's constitutional rights. Miceli may continue to be in danger, but none of the defendants are presently responsible for his safety. As the allegations of the complaint suggest no basis for avoiding the bar of the statute of limitations, this suit is dismissed as frivolous.

ENTER:

PAUL E. PLUNKETT
UNITED STATES DISTRICT JUDGE

DATED: November 2⁰, 2002